**The STATE of Ohio, Appellee,**

v.

**DULANEY, Appellant.**

[Cite as *State v. Dulaney,* 180 Ohio App.3d 626, 2009-Ohio-79.]

Court of Appeals of Ohio,
Third District, Union County.

Nos. 14–08–30 and 14–08–31.

Decided Jan. 12, 2009.

Victoria Stone Moledor, for appellee.

Alison Boggs, for appellant.

PRESTON, Judge.

{¶ 1} Defendant-appellant, Cleophus Dulaney, appeals the Marysville Municipal Court's judgment of guilty and imposition of sentence on one count of telephone harassment and one count of inducing panic. For the reasons that follow, we affirm.

{¶ 2} The charges stem from events that occurred on February 15, 2008. Dulaney had worked nine years for Mattress Mart, also known as Quilting Incorporated and King Coil, and although the circumstances of Dulaney's termination are unclear, it is clear that he was no longer working for the company on the date of the incident. On February 15, 2008, Dulaney allegedly called Mattress Mart three times to discuss issues he had concerning his commission paycheck and health insurance. During these three phone calls, Dulaney allegedly used profanity and threatened two of the company's members, which resulted in the business closing its doors and the police being called to the business.

{¶ 3} Dulaney was charged with telecommunications harassment in violation of R.C. 2917.21(B), a misdemeanor of the first degree, and inducing panic in violation of R.C. 2917.31(A)(2), a misdemeanor of the first degree. The matter was set for a bench trial on June 23, 2008, and the trial court ultimately found Dulaney guilty of both charges. As to the telecommunications-harassment charge, the trial court sentenced Dulaney to 30 days in jail and imposed a fine of $300, but suspended 29 of the days and $150 of the fine and imposed three years of probation. As to the inducing-panic charge, the trial court sentenced Dulaney to 30 days in jail and imposed a $300 fine, but suspended 28 of the days and $150 of the fine and imposed three years of probation. The jail sentences were to run consecutively.

{¶ 4} Dulaney now appeals and raises one assignment of error.

## ASSIGNMENT OF ERROR

The trial court's decisions finding appellant guilty of telephone harassment and inducing panic are both against the manifest weight of the evidence and sufficiency of the evidence and must be reversed.

{¶ 5} Dulaney's assignment of error incorporates two different standards of appellate review for this court to evaluate with respect to two different R.C. violations. We will first address the telecommunications-harassment conviction.

{¶ 6} As to reviewing the trial court's decision under the sufficiency-of-evidence standard, "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average

mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.

{¶ 7} Dulaney was charged with committing telecommunications harassment, which is defined under R.C. 2917.21(B) as follows:

No person shall make or cause to be made a telecommunication, or permit a telecommunication to be made from a telecommunications device under the person's control, *with purpose to abuse, threaten, or harass another person.* (Emphasis added.)

{¶ 8} At trial, the state presented testimony from Sandy Weber, the company's controller, and Karen Messer, the company's receptionist. Weber testified that she received a phone call from Dulaney on February 15, 2008, concerning issues with his commission paychecks and his health insurance. Although Weber admitted that Dulaney never threatened her directly during their conversation, concerning the harassing nature of Dulaney's phone conversation, she stated:

A. Mr. Dulaney was extremely angry, screaming, shouting obscenities, accusing me of having screwed him up on his pay and on his health insurance. Would not let me get a word in edgewise. Because of his anger and his language, I said to Mr. Dulaney, I'm hanging up now. I do not have to listen to this.

Q. Okay. How long did the phone conversation take?

A. Probably about a couple of minutes.

* * *

Q. What did he say?

A. He was concerned or thought that I had screwed up his health insurance and that I had basically given him problems because of his young daughter. That he did not understand how the policy worked at our company. He was angry over pay that I had not paid him properly. And kept shouting that he needed me to fix it and that he wanted it right now. But being angry and using—cursing at me, telling me I was disrespecting him. And he was getting angrier by the moment. He basically kept talking to where I could not get a word in edgewise. And because of his screaming and carrying on, I just said there's nothing I can do and it was offensive language. And I said, Cleo I'm hanging up.

Q. And he was using profanity?

A. Yes.

After Weber ended the conversation, she testified that she went out to Karen Messer, the company's receptionist, and told her that she did not want to speak to Dulaney again if he called back.

{¶ 9} Next, the state called the receptionist, Karen Messer, who spoke to Dulaney during his other two phone calls. Messer testified that right after Weber came out and told her that she did not want to receive any more phone calls from Dulaney, Dulaney called again. Messer answered his call, and Dulaney asked to speak to Weber, but Messer told him that Weber did not want to talk to him. Then Dulaney asked to speak to the company's owner, Ben Tiburzio, but Messer informed him that Tiburzio did not want to talk to him, either. Messer stated that at that time, Dulaney started telling her why he was upset, "because of his commission and his pay check," but Messer told him that she was not allowed to talk to him, and then she hung up the phone. However, Messer said that Dulaney called back immediately after she had hung up, for a third time that day. Messer testified as to what Dulaney told her during the third phone call:

A. That's when he said to tell that bitch to—she better have his paperwork ready when he gets in there. That he was going to come in and kick their ass, Ben and Sandy, and if she didn't have the paperwork ready. And if I wanted to, I could call the police.

After Dulaney ended the phone call, Messer told Weber, who then called the police. Messer also testified that as a result of Dulaney's threat, the company "shut everything down, locked the doors, which included the warehouse doors and everything, and informed the employees if they [saw] him, to not let him in." In response to how long after the third phone call it took the police to arrive at the business, Messer stated that "they were there very fast. I mean, probably within 15 minutes, if that long." Although Messer testified that she had never known Dulaney to have made any threats towards anyone at the company before, she did state that after his third phone call, she was scared and felt that her safety was in jeopardy. However, Messer testified that Dulaney never came.

{¶ 10} The defense called only Dulaney to testify. He stated that the reason he had called the company was to talk to Weber about his commission paychecks and his health-insurance coverage. He claimed that the company had taken an additional $200 out of his commission, an amount that they had previously deducted from his paycheck while he had been working. In addition, Dulaney testified that when he had recently taken his daughters to the doctor, he was told that his policy had been cancelled, even though he claimed that the company was still taking premiums for his insurance out of his paycheck. Dulaney admitted that he was angry when he spoke to Weber and that he had used "some

profanity" during his conversation with her. However, he denied ever threatening her or being angry when he called back after Weber had hung up on him. Dulaney said that when he called back, he spoke to Messer and tried to explain to her his situation with Weber and the company. Dulaney testified that at the end of the conversation, he told Messer that he would stop by in about 15 minutes to pick up his paperwork, but he never showed up because he ended up driving around the city and just "forgot about it." Moreover, Dulaney denied that he had made any statement about "kicking somebody's ass," and that he never used profane language while he was talking to Messer. He also denied threatening anyone.

{¶ 11} As to the telephone-harassment conviction, Dulaney argues that although the language he used may have been "reprehensible and offensive," there was insufficient evidence to find that it constituted telephone harassment, because his ultimate purpose was to inquire about his health-insurance and commission checks. We disagree.

{¶ 12} Again, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668. After reviewing the record, we find that during his third phone call, Dulaney's statement to Messer that he "was going to come in and kick their ass" constituted a threat. See *State v. Allsup,* 3d Dist. No. 6–07–13, 2008-Ohio-159, 2008 WL 170059, ¶ 37 (finding that defendant's statement that the officers "were in a very dangerous position" constituted a threat and that there was sufficient evidence to find that defendant had committed the crime of telephone harassment). Additionally, both Messer and Weber took his comment as a threat of harm, since Messer became scared after hearing Dulaney's threat, and Weber, in response, called the police and had the company close its doors. When reviewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found that Dulaney made at least the third call with the purpose to threaten, harass, or abuse another person. *Allsup,* 2008-Ohio-159, 2008 WL 170059, at ¶ 37. Accordingly, we hold that there was sufficient evidence for the trial court to find Dulaney guilty of telephone harassment under R.C. 2917.21(B).

{¶ 13} Dulaney also argues that the telecommunications-harassment conviction was against the manifest weight of the evidence. In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, " '[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in

resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 14} Dulaney argues that his telephone-harassment conviction was improper because, as he cites, "the key issue is not whether the alleged victim is annoyed or otherwise affected by the call; rather, the purpose of the person who made the call is at the heart of the offense." *State v. Patel,* 7th Dist. No. 03 BE 41, 2004-Ohio-1553, 2004 WL 614986, ¶ 7, citing *State v. Bonifas* (1993), 91 Ohio App.3d 208, 211–212, 632 N.E.2d 531. Dulaney claims that because his purpose was to "inquire, albeit maybe in an emotional way," about his insurance and commission, he cannot be found guilty of telephone harassment because his purpose was not to "abuse, threaten, or harass another person."

{¶ 15} As previously stated, we found that there was sufficient evidence for the trial court to find Dulaney guilty of telephone harassment, considering that his statement that he "was going to come in and kick their ass" constituted a threat. While Dulaney testified at trial that he did not threaten anyone, nor did he have the intent to threaten anyone, he did admit that he had used profanity and was angry when he was on the phone with Weber. In addition, there was testimony from Messer, who told Weber about Dulaney's threat, which caused Weber, in response to Dulaney's threat, to call the police and have the business close its doors temporarily. Additionally, Messer stated that she was scared and feared for her safety after hearing Dulaney's threat.

{¶ 16} This court has previously stated that "'[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'" *Phelps v. Horn's Crop Serv. Ctr.* (Oct. 18, 1990), 3d Dist. No. 16–89–8, 1990 WL 157282, at *2, quoting *State v. Awan* (1986), 22 Ohio St.3d 120, 123, 22 OBR 199, 489 N.E.2d 277. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 81, 10 OBR 408, 461 N.E.2d 1273.

{¶ 17} After hearing all the evidence, the trial court made the following findings:

[b]ased on the evidence that I heard, largely the evidence that Miss Messer gave from the witness stand, the court's—she testified that the defendant said in the third telephone call that he was going to kick their ass, referring to Sandy Weber and Mr. Traverzio [sic; Tiburzio]. So the court on that basis finds that the defendant is guilty of the offense of telecommunications harassment.

Clearly, the trial court chose to give more weight to the state's witnesses, particularly Messer's testimony, than to Dulaney's testimony. This court will not second-guess the trial court's decision. Moreover, the record does not demonstrate that the trial court clearly lost its way or created a miscarriage of justice when it found Dulaney guilty of telephone harassment.

{¶ 18} Dulaney's assignment of error as to the telecommunications-harassment conviction is, therefore, overruled.

■ {¶ 19} As to the inducing-panic conviction, Dulaney claims that there was insufficient evidence to find him guilty of inducing panic because (1) his phone call did not cause the employees at the facility to evacuate, but instead, they only locked down the facility, and (2) the business is not a public place. We disagree.

{¶ 20} The crime of inducing panic is defined under R.C. 2917.31(A)(2) as follows:

(A) No person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by doing any of the following:
* * *

(2) Threatening to commit any offense of violence.

Based on the discussion above, Dulaney's comment to Messer that he was "coming to kick their ass" satisfies the element of "threatening to commit any offense of violence" under R.C. 2917.31(A)(2). It is also clear based on the record that there was never any evidence of an evacuation of the business. Thus, the question becomes whether there was sufficient evidence to show that Dulaney's threat to commit an offense of violence caused a "serious public inconvenience or alarm" to warrant a conviction under R.C. 2917.31(A)(2). Based on the record, in this case, we believe that there was sufficient evidence to support this element.

{¶ 21} Under the 1973 Committee Comment to H.B. 511, which amended R.C. 2917.31, the overall goal of the offense "inducing panic" was stated as follows:

The gist of an offense under this section is causing a public place to be evacuated or otherwise causing serious public inconvenience or alarm, and the section is designed primarily to avoid the harm which may result from panic. For example, a false bomb threat which causes airport officials to have the terminal cleared or passengers disembarked from a plane, or which delays scheduled flights, all while a search for the non-existent bomb is undertaken, is

a violation under the section. Other examples of violations include deceptively causing a meeting to be cancelled for fear of the safety of those attending, or engaging in a free-for-all fight in a bar which causes the customers to scurry for the exits.

Thus, under the committee's comments, the statute was not intended to cover only the ultimately serious threat of a bomb on an airplane. The committee's comments state that cancelling a meeting for fear of the safety of those attending would equally be sufficient grounds to give rise to an inducing-panic conviction.

{¶ 22} Here, there is evidence in the record that could support the element of "serious public inconvenience or alarm." During Messer's testimony, Messer testified that as a result of Dulaney's threat, the company "shut everything down, locked the doors, which included the warehouse doors and everything, and informed the employees if they [saw] him, to not let him in." She went on to state that the police arrived very quickly, "probably within 15 minutes, if that long." In addition, Messer stated that she was scared and felt that her safety was in jeopardy. Therefore, there was evidence presented to the trial court that the business and its employees were locked in, or inconvenienced, for a period of time until the police arrived. Furthermore, employees were told to lock down and to specifically not let in Dulaney if they saw him try to enter the facility.

{¶ 23} This case is distinguishable from the Court of Appeals for the First District case of *State v. Isham*, 1st Dist. No. C–020065, 2002-Ohio-5815, 2002 WL 31398595. In *Isham*, the First District reversed the trial court's judgment of conviction on an inducing-panic charge against the defendant because the state had not presented sufficient evidence to support the elements of inducing panic. The court explained that there had been no evidence of an alleged offense of violence since there was no evidence that the defendant had threatened anyone or pointed the gun at anyone. In addition, the court went on to state that there had likewise been no evidence that any offense of violence (if there had been one) caused the evacuation of the building, because the alleged offense of violence occurred *after* the building had already been evacuated.

{¶ 24} In this case, there was no evacuation, but there was evidence of a serious public inconvenience or alarm to the people inside the business of Mattress Mart because they were locked in until the police arrived and were told to not let Dulaney inside. There was also evidence that this serious inconvenience or alarm was the direct result of Dulaney's threat against Sandy Weber and Ben Tiburzio, because after Weber was informed of this threat, she called the police and announced to the employees that the business was being locked down until further notice. Moreover, there was evidence that Dulaney's threat caused at least one employee, who was not directly threatened, to be scared and to fear for her safety.

{¶ 25} We find that the above evidence, if believed, would have been sufficient to have convinced a rational trier of fact of Dulaney's guilt beyond a reasonable doubt as to the inducing-panic charge. *Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668. Additionally, when reviewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could have found that Dulaney's threat to commit an offense of violence caused a serious public inconvenience or alarm. Id. Accordingly, we hold that there was sufficient evidence for the trial court to find Dulaney guilty of inducing panic under R.C. 2917.31(A)(2).

{¶ 26} Dulaney also argues that his inducing-panic conviction was improper and against the manifest weight of the evidence because the statute was intended to prohibit conduct such as "causing an airport terminal or other *public place* to be evacuated by sending the customers to scurry for the exits." (Emphasis added.) *State v. Jordan,* 4th Dist. No. 05CA16, 2006-Ohio-387, 2006 WL 225384, ¶ 17. Based on the purpose of the statute, he claims that the response of the business in closing its doors did not result in any serious public inconvenience or alarm.

{¶ 27} As previously stated, we found that there was sufficient evidence for the trial court to find Dulaney guilty of inducing panic, considering that his statement that he "was going to come in and kick their ass" constituted a threat to commit an offense of violence. In addition, there was testimony from Messer, who told Weber of Dulaney's threat; and Weber, in response to Dulaney's threat, called the police, had the business close its doors temporarily, and told employees not to let Dulaney inside. Additionally, Messer stated that she was scared and feared for her safety after hearing Dulaney's threat.

{¶ 28} The trial court considered all the evidence that had been presented and found Dulaney guilty of inducing panic, primarily relying on Messer's testimony. Clearly, the trial court chose to give more weight to the state's witnesses, particularly Messer's testimony. This court will not second-guess the trial court's decision; moreover, the record does not demonstrate that the trial court clearly lost its way or created a miscarriage of justice when it found Dulaney guilty of inducing panic. *Seasons Coal Co.,* 10 Ohio St.3d at 81, 10 OBR 408, 461 N.E.2d 1273. The trial court's finding was not against the manifest weight of the evidence.

{¶ 29} Dulaney's assignment of error as to the conviction of inducing panic is, therefore, overruled.

{¶ 30} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

Judgments affirmed.

WILLAMOWSKI, J., concurs.

ROGERS, J., concurs in part and dissents in part.

ROGERS, Judge, concurring in part and dissenting in part.

{¶ 31} I concur in the result reached by the majority on the offense of telephone harassment because multiple calls were placed within minutes of each other and included a threat of violence. However, in considering the sufficiency of the evidence on the offense of inducing panic, I dissent. I would find that the threat to "kick their ass" did not rise to the level required for a finding that appellant caused *serious public* inconvenience or alarm. Had appellant threatened the use of a gun or explosive, I would have concurred in the result reached by the majority.